In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 20-2207

LEONARD KIDD,

*Petitioner-Appellant,*

*v.*

DAVID GOMEZ, Warden, Stateville Correctional Center,

*Respondent-Appellee.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17 C 7031 — **Robert W. Gettleman**, *Judge.*

---

ARGUED MAY 11, 2021 — DECIDED JUNE 22, 2021

---

Before EASTERBROOK, RIPPLE, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Twice, Petitioner Leonard Kidd voluntarily testified under oath that he murdered four people in January 1984. He is serving a life sentence for those crimes.

Kidd now seeks habeas relief because the police allegedly coerced a separate confession from him on the night of the murders. We decline to grant such relief because even if the allegedly coerced confession was improperly admitted at

Kidd's trial, the admission did not have a "substantial and in-jurious effect or influence" on the jury's verdict. *Brecht v. Abra-hamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). We thus affirm the decision of the district court denying Kidd's habeas petition.

## I. BACKGROUND

On the morning of January 12, 1984, Leonard Kidd stabbed four people to death in a Chicago apartment building. The building was then set on fire.

After the fire was extinguished, Kidd approached one of the firefighters standing outside the building and asked if an-yone inside was dead. The firefighter said that four bodies were recovered. Kidd then asked if the bodies had been burned. The firefighter said no. Kidd responded, "Damn," and walked away.

Later that day, Chicago police officers arrested Kidd's half-brother, Leroy Orange, as a suspect. A short time after that, Kidd called Orange's wife and asked to meet because he had something to tell her that "could put me and [Orange] away for the rest of our lives." Kidd met that afternoon with Orange's wife, who had arranged for the police to spy on the meeting. Kidd told her that Orange had paid someone to stab one of the victims. The police immediately arrested Kidd.

They then took Orange, his wife, and Kidd to Chicago Po-lice Area 2 headquarters for questioning. Over the next day, Kidd gave various statements to the police that implicated both himself and Orange in the crimes, though these accounts identified Orange as the primary perpetrator and Kidd as a relatively passive bystander. Kidd also led the police to

several pieces of evidence, including a knife stained with trace amounts of one of the victim's blood.

Illinois charged both Orange and Kidd with murder. Their trials were separated early on.

At Orange's trial in May 1985, Kidd changed his story and voluntarily testified under oath that he alone, not Orange, committed the four 1984 murders. Orange corroborated Kidd's testimony. Orange was convicted but later pardoned by then-Illinois Governor George Ryan.

A few months later, Kidd pled guilty to the 1984 murders. He again testified under oath at his sentencing hearing that he stabbed all four victims. Kidd was sentenced to death.[1]

The Illinois Supreme Court later vacated Kidd's guilty plea and remanded his case for trial because the trial court failed to properly admonish him about the minimum and maximum penalties of his plea.

On remand in 1992, Kidd moved to suppress his statements to police from the night of the murders as an unlawfully coerced confession. Specifically, Kidd alleged that on that night, the police handcuffed him to a pole in the interview room, slapped his face, shocked his testicles, and put a phone book by his head before striking the book with a piece of wood. To support these allegations, Kidd produced a photo from that night showing a mark on his forehead. He also alleged that he was under the influence of drugs when he made

---

[1] During Kidd's proceedings, prosecutors learned that he was also involved in a 1980 arson that killed ten children; for those murders, he is currently serving a life sentence.

the statements, that the police refused to let him contact a lawyer, and that the police threatened to kill him.

The state trial court held a hearing on the motion to suppress. Kidd did not testify, but the police officers who were involved did and denied Kidd's allegations. One officer said that he noticed a mark on Kidd's head, but Kidd explained to him that he had suffered that injury two weeks earlier during an unrelated robbery. The court ultimately credited the officers' testimonies over Kidd's allegations and concluded that there was no evidence that Kidd "was struck, mistreated, abused," or "in any way forced to make the statement." The court thus denied his motion to suppress.

Kidd's case went to trial, and the jury found him guilty on all counts and sentenced him to death. His conviction and death sentence were affirmed on direct appeal, but in 2003, Governor Ryan commuted his sentence to life imprisonment without the possibility of future release.

Kidd proceeded to file (and repeatedly amend) a *pro se* state postconviction petition alleging that he was abused by the police, including former Chicago Police Officer Jon Burge, who was found in other cases to have abused many people at Chicago Police Area 2 headquarters around the time of Kidd's arrest. The state trial court denied the petition on the pleadings without discovery or an evidentiary hearing. The Illinois Appellate Court affirmed, and the Illinois Supreme Court denied review.

Kidd then filed this federal-court petition for a writ of habeas corpus. He argues that the Illinois Appellate Court made an unreasonable determination of fact when it concluded that he was not abused by the police. The district court denied the

petition and declined to grant a certificate of appealability.
Kidd now appeals.

## II. ANALYSIS

Kidd's petition is governed by the Antiterrorism and Ef-
fective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.
Under this statute, a petitioner must establish that the state
courts' adjudication of his case "was contrary to, or involved
an unreasonable application of, clearly established Federal
law, as determined by the Supreme Court of the United
States," or "was based on an unreasonable determination of
the facts in light of the evidence presented in the State court
proceeding." *Id.* § 2254(d). We review the district court's de-
nial of a petition for writ of habeas corpus *de novo. Carter v.
Thompson*, 690 F.3d 837, 843 (7th Cir. 2012).

This appeal turns on harmless error. Habeas petitioners
"are not entitled to habeas relief based on trial error unless
they can establish that it resulted in 'actual prejudice.'" *Czech
v. Melvin*, 904 F.3d 570, 577 (7th Cir. 2018) (quoting *Brecht*, 507
U.S. at 637). For an error to result in actual prejudice, it must
have "had substantial and injurious effect or influence in de-
termining the jury's verdict." *Id.* (quoting *Jones v. Basinger*, 635
F.3d 1030, 1052 (7th Cir. 2011)).[2]

---

[2] The Supreme Court has granted certiorari in another case to decide
whether a federal court may grant habeas relief based solely on *Brecht* or
whether it must also find that the state court's harmlessness determination
was itself unreasonable under AEDPA. *See Brown v. Davenport*, No. 20-826,
2021 WL 1240919 (U.S. Apr. 5, 2021). That decision will not change the
outcome of this case because we are not presented here with a harmless-
ness determination by the Illinois courts. Further, because we determine
that Kidd cannot even satisfy the *Brecht* standard, he certainly could not

Here, the admission of Kidd's allegedly coerced confession, if improper at all, was harmless in light of his two voluntary confessions under oath that he committed the 1984 murders. "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139 (1968) (White, J., dissenting)). Multiply that by two, as the facts here demand, and we have no question that the admission of Kidd's additional, allegedly coerced confession did not result in actual prejudice. *Hinton v. Uchtman*, 395 F.3d 810, 819 (7th Cir. 2005) ("[T]he admission of his [coerced] confession was harmless in light of the wealth of evidence of his guilt, *separate and distinct from his [coerced] confession*.").

Kidd attempts to discredit his two voluntary confessions by arguing that the government used them at trial merely to show that he was a liar, not that he was guilty. But that doesn't undercut their force. Remember that Illinois prosecuted two people for the 1984 murders—Kidd and Orange. On the night of the murders, Kidd made an allegedly coerced statement that incriminated both himself and Orange but blamed Orange for actually carrying out the murders. Then, over a year later, Kidd confessed twice more, but these times he said that he alone committed the crimes.

Because Illinois was prosecuting both Kidd and Orange, it obviously did not rely on any of these accounts as the rock-solid story. Otherwise, it would have had to drop one of its

---

satisfy both the *Brecht* and the AEDPA standards should the Supreme Court require that both apply.

cases. There's no doubt, though, that Kidd's later, unchallenged confessions, which were introduced at Kidd's trial, were the far more incriminating ones. So had the least incriminating of his three confessions been excluded—as Kidd says it should have been—Kidd actually would have been in a worse position. And the admission of that statement thus did anything but prejudice his defense.

Kidd also argues that our conclusion improperly rests on a "sufficiency of the evidence test" rather than the *Brecht* "actual prejudice" standard. Kidd is correct that the *Brecht* analysis "is not the same as a review for whether there was sufficient evidence at trial to support a verdict." *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. 2015). Still, an abundance of incriminating evidence can show that one arguably improper admission had no effect on the jury's verdict. *Hinton*, 395 F.3d at 820–21 ("Indeed, the witnesses at trial … repeated … [Petitioner]'s pretrial confession statement. Therefore, the confession statement itself was merely cumulative and even if we were to assume that its admission at trial was erroneous, any error would be harmless." (citing *Brecht*, 507 U.S. at 639; *United States v. Thompson*, 286 F.3d 950, 962 (7th Cir. 2002))).

In this case, the abundant and damning evidence of Kidd's guilt—namely, his two voluntary confessions under oath—does more than just provide a sufficient basis for the verdict to stand on; it shows that the allegedly improper admission of his coerced statement did not have a substantial and injurious effect on the jury's verdict.

### III. CONCLUSION

Kidd twice testified that he murdered four people on January 12, 1984. Regardless of any abuse that he might have

suffered at the hands of the police that night, he must live with the stories he voluntarily told under oath at a later time. *See Hinton*, 395 F.3d at 822 (Wood, J., concurring) ("Coercion or even torture at the confession stage did not give him license to commit perjury."). We thus AFFIRM the decision of the district court denying Kidd's petition for a writ of habeas corpus.